**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| LTJ Enterprises, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Custom Marketing Co., LLC, <br><br> Defendant. | Court File No. 13-cv-2224 (ADM/LIB) |

Plaintiff's Expert Report of John S. Titus under Rule 26 (A)(2)(b)

EXHIBIT 1

## INTRODUCTION

I have been retained by Plaintiff LTJ Enterprises, Inc. ("LTJ") in connection with the litigation entitled *LTJ Enterprises, Inc. v. Custom Marketing Co., LLC*, to provide opinions regarding infringement of U.S. Patent no. 6,067,927 ("the '927 Patent") and LTJ's bin level indicator trade dress resulting from Custom Marketing Co., LLC's ("CMC") marketing of CMC's bin level indicator.

I may prepare additional demonstrative exhibits or other documents for use at trial or prior to my testimony based on documents and information relied upon and my analysis of those documents and information.

## STATEMENT OF OPINIONS TO BE EXPRESSED AND BASES AND REASONS THEREFORE:

1. Opinions to be expressed;

    a. Defendant's ("CMC's") bin level indicator sold under the trademark Grain Gauge ("Grain Gauge") infringes Claims 18, 21, 24, 26, and 27 of Plaintiff's ("LTJ's") U.S. Patent no. 6,067,927 ("the '927 patent") titled VISUAL INDICATOR.

    b. LTJ's bin level indicator has a trade dress as it has an overall appearance that has acquired a secondary meaning that LTJ is the source of the LTJ bin level indicator.

    c. CMC's bin level indicator appropriates LTJ's bin level indicator trade dress resulting in a likelihood of confusion by consumers in the

marketplace as to source, association, relationship or approval by LTJ of CMC's bin level indicators.

       d.    At the time of the first sale of it's bin level indicators, CMC had an extraordinarily high likelihood of violation of both the '927 patent and LTJ's trade dress, and CMC did not take appropriate measures to avoid infringement.

  2.    Bases for opinion;

       a.    My knowledge and experience obtaining intellectual property rights before the U.S. Patent and Trademark Office.

       b.    My knowledge of mechanical engineering, and industrial systems engineering.

       c.    My knowledge and experience creating new businesses and developing new products for sale.

       d.    My personal examination of LTJ's bin level indicators.

       e.    My personal examination of CMC's bin level indicators.

       f.    My comparison of the claims of the '927 patent.

  3.    Reasons for the opinions;

       **A.**    **Patent Infringement**

       i.    The Defendant's Grain Gauges infringe claims 18, 21, 24, 26, and 27 of the '927 Patent. To determine patent infringement, a two-part determination was made. First, the claims have been interpreted according to the guidelines set forth in the Court's Order Constructing Claims. Then, the elements found in the claims were compared to the structure of a Grain Gauge. I

made an element-to-element comparison using the claims as constructed by The Court. This element to element comparison is shown in Exhibit 1.

      ii.    CMC has admitted to the presence of a number of the elements in each claim.

      iii.    LTJ is the owner of the '927 Patent through assignment from one inventor, and the estate of the other inventor.

    **B.**    **Trade Dress**

      i.    LTJ's significant commercial success and continued use of certain elements in it's product, namely, the two cylinders, the specific color of the cylinders, the body, the shape of the body, the specific color of the body, the background elements, and the configuration of all of these elements have acquired a secondary meaning identifying LTJ as the source of the bin level indicators.

      ii.    There are a number of possible alternative designs which would indicate the level of the contents in a bin.

    **C.**    **Infringement of LTJ's Intellectual Property was intentional**

      i.    CMC deliberately attempted to take over LTJ's market share by creating a product nearly identical to LTJ's bin level indicator without regard for any of LTJ's intellectual property rights. CMC was well aware of the risk of infringement of both the '927 patent and LTJ's trade dress. CMC's actions concerning the development of the Grain Gauge were not reasonably calculated to avoid violation of LTJ's rights.

        ii.    It is clear from the correspondence and similarity of the final product that no alternative designs were implemented.  The only substantive instructions given to the product designers was inadequate to properly construct a non-infringing alternative.  Given the knowledge and abilities of the engineers at MFG, they could not reasonably rely on that advice.

    **D.**    **Other**

4.    My CV and list of publications I have authored is attached hereto as Exhibit 2 and 3.  I reserve the right to include additional publications as they become relevant.

5.    A list of documents I have reviewed is attached hereto as Exhibit 4.

6.    I am being paid $150 per hour for actual time spent on study and testimony.

**[SIGNATURE PAGE TO FOLLOW]**

Date: 7/8/2015 By: _____
John S. Titus

Exhibit 1
Claim Chart of John S. Titus

| **U.S. Patent No. 6,067,927** <br><br> **Claim 18** | **CUSTOM MARKETING CO., LLC** <br><br> **GRAIN GAUGE INDICATOR** |
|---|---|
| An indicator for providing an indication of the level of material in a bin containing the material, said bin having a side wall with a hole for accommodating the indicator comprising: | Element present |
| a body | Element present |
| visual means having an outer surface for indicating the level of the material in the bin, | Element present |
| means rotatably mounting the visual means on the body for movement between an ON position and an OFF position indicating the level of the material in the bin, | Element present |
| a transparent member attached to the body enclosing the visual means within the body and transparent member, | Element present |
| means having a bright color on a first portion of the outer surface providing a visual indication of the ON position of the indicator, | Element present |
| the remaining portion of the outer surface having a dark color providing a visual indication of the OFF position of the indicator, | Element present |
| an arm, | Element present |
| means pivotally mounting a first end portion of the arm on the body for movement between first and second positions, | Element present |

| **U.S. Patent No. 6,067,927** <br><br> **Claim 18** | **CUSTOM MARKETING CO., LLC** <br><br> **GRAIN GAUGE INDICATOR** |
|---|---|
| motion transmitting means connecting a second end portion of the arm to the visual means operable to rotate the visual means between the ON and OFF positions in response to generally upward and downward movement of the second end portion of the arm, and | Element present |
| actuator means connected to the arm adapted to be located within the bin for moving the arm to the first position when the material in the bin engages the actuator means and moving the arm to the second position when the material in the bin does not engage the actuator means whereby the arm operates the motion transmitting means which rotates the visual means between its ON and OFF positions. | Element present |
| **Claim 21** | |
| The indicator of claim 18 wherein: <br><br> the means having a bright color is a colored tape attached to about one-half of the outer surface of the visual means. | Element present |

| **U.S. Patent No. 6,067,927**<br><br>**Claim 24** | **CUSTOM MARKETING CO., LLC**<br><br>**GRAIN GAUGE INDICATOR** |
|---|---|
| An indicator for providing an indication of the level of material in a bin containing material, said bin side wall with a hole for accommodating the indicator comprising: | Element present |
| a body, | Element present |
| visual means having an outer surface rotatable mounted on the body for movement between an ON position and an OFF position, | Element present |
| a transparent member attached to the body enclosing the visual means within the body and transparent member, | Element present |
| means having a bright color on a first portion of the outer surface providing a visual indication of the ON position of the indicator. | Element present |
| the remaining portion of the outer surface having a dark color providing a visual indication of the OFF position of the indicator, | Element present |
| an arm, | Element present |
| means movably mounting the arm on the body for movement between first and second positions, | Element present |
| motion transmitting means connecting the arm to the visual means operable to rotate the visual means between the ON and OFF positions in response to movement of the arm, and | Element present |

| **U.S. Patent No. 6,067,927** <br><br> **Claim 24** | **CUSTOM MARKETING CO., LLC** <br><br> **GRAIN GAUGE INDICATOR** |
|---|---|
| actuator means connected to the arm adapted to be located within the bin for moving the arm to the first position when the material in the bin engages the actuator means and moving the arm to the second position when the material in the bin does not engage the actuator means whereby the arm operates the motion transmitting means which rotates the visual means between its ON and OFF positions, | Element present |
| the motion transmitting means includes <br><br> a rack having teeth connected to the arm, and <br><br> a gear joined to the visual means, <br><br> said teeth of the rack being engageable with the gear whereby movement of the arm rotates the visual means between its ON and OFF positions. | Element present |
| **Claim 26** <br><br> The indicator of Claim 24 wherein: <br><br> the visual means includes a pair of cylindrical members having cylindrical outer surfaces, | Element present |
| said means having a bright color being on first portions of each cylindrical outer surface. | Element present |
| **Claim 27** <br><br> The indicator of Claim 26 wherein: <br><br> the motion transmission means is located between the cylindrical members. | Element present |

PROFESSIONAL CURRICULUM VITAE OF
JOHN S. TITUS
5331 Frost Point
Prior Lake, MN 55372-1906
952-440-5412 fax 952-440-5413
jtitus@integra.net

Throughout his professional career Mr. Titus has both been a member and an active contributor to several professional associations, beginning in 1962 with a student membership in the Society of Manufacturing Engineers (SME). He also became a member of the Computer and Automated Systems Association (CASA) branch of SME. Mr. Titus was also a member of the Numerical Control Society. He became a founding member of the local Minneapolis Viking Chapter in 1964 and served in several official capacities culminating as Chairman in 1979. In 1981 he began serving on NCS's national board of directors and became international president in 1985. In that year the society's name was changed from Numerical Control Society to Association for Integrated Manufacturing Technologies (AIMTECH). During his term in national office, Mr. Titus co-founded the Numerical Control Society Institute, providing educational and training programs in numerical control technology and the applications of computer technology to manufacturing. During his association with these technical professional societies, Mr. Titus has written and published numerous technical papers, all of which have been publicly presented in local, national or international forums.

In 1984 Mr. Titus wrote and presented a paper to the Sobrocan Professional Society in Sao Paulo, Brazil, entitled, "Network Communications for Computer Aided Manufacturing," exploring the need for an international protocol for the exchange of manufacturing information through public network communication services. The X.25 standard was proposed as a candidate for the time, however the Internet later became that envisioned world wide network.

Mr. Titus has also been a member of the SME Speakers Directory for several years and been a member of the staffs of several SME educational clinic programs. Participation in these programs has provided Mr. Titus with numerous speaking engagement opportunities where he has publicly lectured on the use of various manufacturing technologies to professional audiences throughout the United States.

In 1987 Mr. Titus was elected to the founding board of directors for the Arcnet Trade Association (A.T.A.) in Chicago. The A.T.A. is a trade association formed to promote and enhance the defacto Arcnet standard computer network technology created by the Datapoint Corporation in 1976. In his role as a director, Mr. Titus participated in several working committees including the Standards Committee, working to achieve Arcnet recognition by the American National Standards Institute (ANSI) and others. At that time, there were over one million Arcnet nodes installed. The envisioned need was accurate; however the Ethernet standard has emerged as the local network for the world.

In the commercial realm Mr. Titus has provided numerous lectures on the use of computers in manufacturing and engineering design from 1975 to the present. Many of these presentations have taken the form of a seminar. For example, in November of 1987, Mr. Titus lectured for one week on the use of Distributed Numerical Control in manufacturing at a seminar in London, England offered by Elliot, Limited, a distributor for Intercim Corporation.

Throughout his professional career, Mr. Titus has practiced as a multi-disciplined engineer involved in the application of technologies. Prior to attending college, Mr. Titus gained valuable

1

skills in machine shop technology by completing an apprentice program for the Melpar Division of Westinghouse. Mr. Titus gained additional practical experience while attending college by working part time for the John Roberts Company, a manufacturer of scholastic class rings, as a tool and die maker. After graduation from Oklahoma University with a BSIE degree, Mr. Titus began employment with Jostens Inc. in Owatonna, MN as a tool and process research engineer. During his ten-year employment with Jostens, Mr. Titus was responsible for numerous innovative manufacturing systems and processes involving the application of new and emerging technologies. One of these processes involved the automated setting of gemstones in jewelry. Mr. Titus and Jostens received several patents for his work in this area. Jostens hired Mr. Titus for his assistance in combating the growing demand on the marketplace of the baby boom in an industry characterized by Old World European hand skills. Mr. Titus successfully applied Computer Aided Design and Computer Aided Manufacturing (CAD/CAM) to the process of designing and creating tooling for the manufacturer of scholastic jewelry. The concepts of CAD/CAM demonstrated by this pioneering effort in 1970 are in common use today. In 1969 while employed by Jostens, Mr. Titus co-founded his first entrepreneurial venture, Musitronic, Inc., an electronic music instrument manufacturer, marketing their products in the educational field. Mr. Titus designed and engineered the product line for this organization, which consisted of mechanical electronic and computer technologies. Several patents were issued to Musitronic and Mr. Titus for his efforts during the ten years prior to the sale of Musitronic in 1979.

Mr. Titus left the employ of Jostens in 1975 and joined National Computer Systems, Inc. as Vice President of the C/DM Division. There, Mr. Titus founded the first commercial venture in the field of CAD/CAM to provide turnkey systems for the design and fabrication of tooling. Mr. Titus was responsible for the sale of several of these early CAD/CAM systems to pioneering buyers such as IBM and Xerox Corporations. National Computer sold a major portion of C/DM, which was renamed CAMAX Systems, Inc. CAMAX was later sold to SDRC Corporation. National Computer Systems has now been sold to Pearson, plc, of the UK.

In 1979 Mr. Titus left National Computer Systems and became a contract product developer. To carry out the development activities, Mr. Titus formed Micronix, Inc. in 1979 and provided design and development services for proprietary products using microcomputer and electronics technologies. Some of these development projects included a diagnostic system for the General Motors automotive engine control computer for the Owatonna Tool Company; a medical device to provide early warning of impending heart attack for use in open heart surgery for the Medical Division of Possis Corporation; a computerized control system for the automatic manufacture of electric motors used in tools and appliances for the Motor Equipment Division of Possis Corporation; a farm tractor mounted computer system for the distribution of liquid fertilizers and pesticides for Hiniker Corporation; and a computerized instrument for use on earth moving equipment to control the angle of grade or slope for the Slope Meter Corporation. In 1982 Mr. Titus co-founded Perception, Inc., a business whose purpose was to create new business opportunities. One of the ventures incorporated by Perception was XTAL Corporation in 1983. In 1987, XTAL acquired a competitor and changed its name to Intercim Corporation.

Intercim provides products in the Computer Integrated Manufacturing (CIM) marketplace. Using Perception resources, Mr. Titus conceived the Intercim product line and was responsible for many of the initial development activities as well as initial system sales. His mechanical and electronic engineering background combined with his knowledge of computer systems, software development and networking communications were all assembled in one entrepreneurial endeavor. Intercim offers a product line called FactoryNet™, which is aimed at networking diverse manufacturing equipment on the factory floor with CAD/CAM systems used in design and manufacturing coordination in order to improve general manufacturing productivity through the use of electronic

2

communications and the minimization of paperflow. FactoryNet™ systems are used both locally in captive manufacturing organizations and remotely over dial up telephone lines. The Intercim sales force sold Intercim products both nationally and internationally as well as through cooperative marketing relationships with IBM, Digital Equipment, Intergraph, MacDonnel Douglas, and Unisys. In co-founding Intercim, Mr. Titus has assisted in the founding of eight Minnesota corporations in his thirty-five year residence. Of the eight, Intercim is the only public corporation having offered its stock for sale through the national over-the-counter market (NASDAC) at its time of founding in 1983. Mr. Titus initially assumed the position of Vice President Research and Development and later became President and Chief Executive Officer. With the broadening of the company through three acquisitions in fiscal 1988, Mr. Titus became Chairman of the Board and Chief Technical Officer. Intercim was sold to Effective Management Systems, (EMS) of Milwaukee, who was later purchased by Industrial Financial Systems,(IFS) of Sweden.

In 1990, Mr. Titus returned to focus his attention to the development of Perception on a full time basis. Perception is providing innovative product design and development services to established companies and private entrepreneurs on a contract basis. Perception acts as a contract "skunk works" utilizing Minneapolis area private contractor experts, and providing the leadership and technical guidance to assure successful project completion. Mr. Titus is currently president of Perception, and it's only employee. Perception has been in continual development of interesting and innovative industrial and consumer products since 1990. Among these developments are; updates to previous client projects, components of a state-of-the-art video surveillance system, an instrument for remote measurement and transmission of liquid tank levels, an indoor/outdoor wireless pet containment system using 900MHz radio, an IBM 5250 protocol network communications controller using FPGA technology, and the engine of an automatic vending machine for the production of new or replacement lock keys. To compliment the lock key machine development project, Mr. Titus co-founded Machine Magic, LLC, a Minnesota company to pursue the commercialization of the Klone-A-Key™ and Accu-Key™ opportunities.

Mr. Titus has also, as a Perception project, patented and is developing a new and novel fluid metering device for liquid and/or gas dispensing. For this venture, he has formed Digital Meter, Inc., a start up company to pursue commercialization of the meter. One market, the Utility industry, has expressed interest in the safety, accuracy and remote control functions of the device. Another market, the irrigation industry, is interested in low cost, automated flow management to equalize the dynamic and ever changing water distribution needs of irrigation systems.

His most recent venture is the co-founding of Tivan, Inc., a manufacturer of motorized storage lift devices for heavy tools or toys. These patented devices can be reviewed at www.loft-it.com on the internet. John has designed the products and directed the contract manufacturing of the products both in the US and in Taiwan and China.

At the date of this writing, John Titus holds over twenty patents on both the design and the utility functions of his career creations. Nearly all of his career projects have demonstrated creative and innovative thinking, leading to patent and/or copyright pursuit by his employer or client partners or by himself.

EXHIBIT 4
DOCUMENTS REVIEWED

1. U.S. Patent no. 6,067,927 ("the '927 patent") titled VISUAL INDICATOR.

2. Assignment of the '927 patent to LTJ Enterprises, Inc. ("LTJ").

3. A bin level indicator LTJ sells under the Trademark "LevAlert" ("LevAlert") together with the packaging and labels applied for distribution and sale.

4. LevAlert Owner's Manual;

5. LevAlert brochure titled "Monitoring Bin Levels has Never Been Easy."

6. LTJ www.levalert.com\ web page

7. LTJ drawings marked Figs. 1-9 prepared in anticipation of this litigation.

8. A letter from Curtis B. Herbert to MFG Solutions, Inc. ("MFG") concerning the '927 patent marked as CMC003073 to CMC003076.

9. The agreement between Custom Marketing Co., LLC ("CMC") and MFG titled "Project Agreement Grain Level Indicator" marked as MFG0076 to MFG0093.

10. A bin level indicator CMC sells under the Trademark "Grain Gauge" ("Grain Gauge") together with the packaging and labels applied for distribution and sale.

11. Two emails from Ryan Douglas to Curtis Herbert with an assembly drawing and a letter concerning "engineering risks" attached marked as CMC003244 to CMC003251.

12. An email from Paul Leverington with pictures of the Grain Gauge marked as CMC000581 to CMC000587.

13. *A Dictionary of Mechanical Engineering* by Tony Atkins and Marcel Escudier (Oxford University Press 2013).

14. Deposition of Ryan G. Douglas.

15. Deposition of Thomas Johnson.

16. Deposition of Paul Leverington.

17. Expert Report of Melissa Snelson, dated July 8, 2015.

18. email from Accountant marked CMC001605.

19. discovercmc.com web page.

20. Complaint dated 08/15/2013.

21. First amended Answer and Counterclaim dated 03/19/2014.

22. Answer to First Amended Counterclaim dated 07/25/2014.

23. Memorandum Opinion and Order dated 06/08/2015 [Doc 59] construing claims of the '927 patent.

24. All documents included in Curtis Herbert's final correspondence regarding the '927 patent to CMC.